[Civ. No. 3531.   Second Appellate District, Division Two.—December 13, 1921.]

## ULA MAY ROTTMAN, Respondent, v. SAM E. ROTTMAN, Appellant.

[1] LACHES — COMMENCEMENT OF ACTION — QUESTION OF FACT. — The question whether a plaintiff has been guilty of laches in commencing an action must be determined upon the facts and circumstances peculiar thereto, and unless the delay has operated to the injury of the defendant, laches canot be charged if the action is brought within the period of limitation.

[2] ID.—RELATIONSHIP OF HUSBAND AND WIFE—APPLICATION OF DOCTRINE.—The doctrine of laches is not strictly applied in cases where the relationship is that of husband and wife.

[3] ID.—RESCISSION OF CONTRACTS—SETTLEMENT OF PROPERTY RIGHTS OF HUSBAND AND WIFE—LACK OF CONSIDERATION—INAPPLICABILITY OF DOCTRINE.—A wife cannot be charged with laches in delaying for the period of three years the commencement of an action to

---

2. Validity of antenuptial contract for release of interests in the property of an intended spouse, notes, Ann. Cas. 1916D, 994; 9 L. R. A. (N. S.) 953.

rescind contracts entered into between herself and her husband settling property rights and releasing him from marital obligations, where no consideration passed to her, and such contracts were executed by her for the purpose of securing to herself the continuance of the relations which she had the right to expect from the very fact of marriage and which he had threatened to deny her if she did not execute the contracts.

[4] HUSBAND AND WIFE — RESCISSION OF CONTRACTS — PLEADING — NEGATION OF ALLEGATION OF UNTRUTHFUL STATEMENTS.—In an action by a wife to rescind contracts entered into between herself and her husband settling property rights and releasing him from marital obligations, it is not necessary for her to negative the truth of the allegations in her complaint that she was induced to sign the contracts by the defendant's statements that his father and uncle would not give him any peace until he had arranged his property matters with her and that by reason of his mind being troubled on that account he could not be to her the husband that he desired to be.

[5] ID.—IGNORANCE OF LEGAL RIGHTS—CONFLICT OF EVIDENCE—SUPPORT OF FINDINGS.—Where in such an action the evidence is conflicting on the issues as to whether the plaintiff was ignorant of the respective rights of herself and her husband under the contracts and was unable to appreciate or understand their legal effect, it cannot be said that the findings in the plaintiff's favor are not supported by the evidence.

[6] ID.—LACK OF CONSIDERATION — EVIDENCE — FINDING — HARMLESS ERROR.—Where the consideration received by a wife for the execution of contracts releasing her husband from all marital obligations is merely nominal, the finding that no consideration passed to her is harmless error.

[7] ID.—PURPOSE OF HUSBAND—RELEASE FROM MARITAL OBLIGATIONS TO WIFE AND AFTER-BORN CHILDREN—FINDING—EVIDENCE.—In this action by a wife for the rescission of contracts entered into between herself and her husband settling property rights and releasing him from all marital obligations, the finding that the husband procured the execution of such contracts in order to effect his release from all obligation to support her, or any child or children that might be born to them, is supported by the evidence, as to herself, but is unsupported as to children.

[8] ID.—CONTRACT BETWEEN HUSBAND AND WIFE—IMMUNITY OF HUSBAND FROM MARITAL OBLIGATIONS—SILENCE AS TO SEPARATION— PUBLIC POLICY.—A contract between a husband and wife which makes no provision for a separation, but which grants him immunity from financial charge, whether they live together or apart, is against public policy.

APPEAL from a judgment of the Superior Court of Imperial County. E. A. Luce, Judge Presiding. Affirmed.

The facts are stated in the opinion of the court.

Dan V. Noland and Meserve & Meserve for Appellant.

Robert M. Pease and Conkling & Brown for Respondent.

WORKS, J.—The parties to this action are husband and wife. A little less than a year and a half after their marriage they, as opposing contracting parties, entered into two written agreements, the rescission of which is the purpose of the present litigation. While there were two contracts between the parties, executed some weeks apart, they in effect really constitute but one obligation, as the second was but an amplification of the first. The earlier of the agreements—and we shall henceforth refer to them, respectively, as the first contract and the second contract— was executed on June 11, 1915. Its terms are introduced by the recital that the parties are husband and wife, that they are desirous of settling all rights of property between them and all monetary obligations of each to the other under their marital relation. Following this premise it is agreed that all property standing in the husband's name is his separate estate and not community property; that all property standing in the name of the wife is her separate property; that the husband, upon the execution of the agreement, will pay to the wife the sum of five dollars, the receipt of which is acknowledged; that, in consideration of such payment, the wife grants to the husband all right, title, or interest which she may have in all property, real or personal, theretofore acquired during coverture and as the common property of the parties; that, further, in consideration of such payment and of the release by the husband to the wife "hereinafter contained," the wife releases the husband "from any obligation of whatsoever kind or nature, either present, past or future, to in any way contribute to the support or maintenance" of the wife, and that the wife "will not at any time apply to any court or take any proceedings against" the husband "wherein or whereby she shall seek to recover" from the husband

"any moneys for her support or maintenance, or for temporary or permanent alimony, attorney's fees or costs in any action which may be hereafter commenced by either" the husband or the wife; that the agreement shall be a receipt to the husband "because of any liability, present or future," by him to the wife; that the husband releases the wife "from any similar obligation" to him; that the parties "mutually agree, one with the other, that any property which may hereafter be acquired by either of the parties hereto shall be deemed and held to be the property of the party so acquiring the same," and the taking of title by the party so acquiring shall be deemed conclusive evidence that the property acquired is the separate property of the party so taking title; and that each party releases, remises, and quitclaims unto the other all right, title, or interest in all real and personal property which the other may hereafter so acquire. The second contract is dated June 26, 1915, but it was not executed until July 12th. This agreement opens with a recital stating the fact that the first contract was executed between the parties; that it was recorded on the date of its execution, the book and page of the record being given; that the parties have been advised to describe with more particularity certain of the properties referred to in the first contract; and that they have agreed that neither should incur any bills against the other, in consideration of which the husband has agreed to pay to the wife an additional five hundred dollars. It is then, following this introduction, agreed that the parties do jointly and severally ratify and confirm the first contract, each stating "that he and she respectively have fully considered said contract, and has been fully advised as to all of its contents and the legal force and effect thereof"; that the husband, at the time of the execution of the agreement, has paid to the wife "an additional" sum of five hundred dollars, the receipt of which by her is acknowledged; that each of the parties will not incur any bill or obligation against the other unless express written authority so to do is first given, the wife "particularly obligating herself" not to incur any bills or obligations against the husband without such authority; that the wife (in paragraph 4 of the contract), in addition to the general grant, release, and conveyance contained in the first contract, "does hereby grant, quit-

claim and convey'' to the husband, ''in particular, all and every right which he [*sic*] has or may claim to have'' in certain described property; that the wife agrees ''that said hereinabove particularly described property, as well as all and every other piece of property standing in the name'' of the husband is his separate property and estate; that the husband (in paragraph 5 of the contract), in addition to the general grant, release, and conveyance contained in the first contract, ''does hereby grant, quitclaim and convey'' to the wife, ''in particular, all and every right which he has or may claim to have'' in certain described property; and that the husband agrees ''that said hereinabove particularly described property, as well as all and every other piece of property standing in the name'' of the wife, is her ''separate property and estate.''

Upon a trial of the issues arising under the pleadings a decree rescinding both agreements was rendered in favor of plaintiff. Defendant appeals.

One of the points made by appellant is that the amended complaint fails to state facts sufficient to constitute a cause of action. The pleading alleges that the parties intermarried January 29, 1914, and ever since have been husband and wife; sets up the first contract; alleges that at the time of its execution, and at all times, the wife was unacquainted with business, ignorant of business matters and unable to understand the legal effect of the contract, or what were the rights of the parties to it, all of which was well known to the husband; that no consideration for the signing of the contract passed between the parties, that the wife received no consideration therefor and was induced to sign it by reason of her love for her husband and her trust and confidence in him and her ignorance concerning the matter, and that by reason of her love for her husband and her trust and confidence in him she signed the contract without legal or other advice in regard to the matter and notwithstanding that he was fully advised concerning it and had legal advice touching it and understood all the rights and obligations of the parties; that the five dollars mentioned in the contract was not paid to the wife, nor was any other sum paid to her or any other consideration given; that to induce the wife to sign the contract the husband stated to her that ''his father and his

uncle would not give him any peace until the defendant had his property matters arranged with his wife as provided in the said contract, and that by reason of his mind being troubled upon that account he could not be to the plaintiff the husband he should and desired to be and that if she would sign the said contract that all would be well between them and that he would continue to live with her and love her as a husband should''; that at the time of the execution of the contract there was no property of record in the name of the wife which was not her separate property' and there was no property of record in the name of the husband which was not his separate property and the husband obtained the contract ''solely and entirely in order that he might thereafter freely violate his marriage vows and by virtue of said agreement might preclude the plaintiff from obtaining from the said defendant thereafter any support or maintenance and in order that he might with impunity abandon the plaintiff and leave her without support,'' and, also, that he might thereafter be free from obligation to support children thereafter born to the parties, and that he might cast upon the wife the burden of supporting such children; that on April 7, 1916, one child was born to the parties, ''now'' of the age of about three years; that the husband has not supported or maintained the child and has contributed but twenty-five dollars toward its maintenance; that the contract was and is unfair in that it was without consideration and its effect was to cast upon the wife the entire burden of supporting' herself and the child, and she signed it only by reason of her love and affection for her husband and her trust and confidence in him, and by reason of his undue influence over her at that time and to give him the peace of mind ''he claimed he could only have when his property matters were arranged to the satisfaction of his father and his uncle''; that at the time the contract was signed it was not known that a child would thereafter be born to the parties; that since the birth of the child the wife has been unable to work and support herself because her time has been entirely taken up with the care and raising of the child, and the contract was and is unfair in that it provided no consideration for the loss by the wife of the time necessarily to be given by her in the care of the child, or her inability to support herself by

her labor owing to the necessity of devoting her time to the care and education of the child; that on June 26, 1915, the husband caused to be drawn up and presented to the wife for her signature the second contract, which is set out in full; that at the time she signed the second contract she loved and trusted her husband and had no advice other than that of her husband, who had advice of an attorney concerning that contract; that no sum was paid and no consideration passed between the parties for the execution of the second contract, and no consideration was received by the wife for or with respect to the execution thereof, but that at the time she signed it she was entirely ignorant of business and of law and did not understand the effect of the agreement, whereas the husband understood it and was advised by attorneys regarding it, and he procured the execution of it in order to procure his release from any obligation thereafter to support the wife or to support any children that might thereafter be born to them; that the property described in the fourth paragraph of the second contract was prior to its execution the separate property of the husband and the property described in the fifth paragraph was the separate property of the wife; that the property standing of record at that time in the name of the wife was her separate property and any property standing of record in the name of the husband was his separate property; that the second contract was unfair in that it was without consideration and in that no provision was made for the maintenance of the wife or of any child or children which might thereafter be born to the parties, whereas the husband was then "and is now" very wealthy, worth about one hundred thousand dollars, and bountifully able to support and care for the wife and for the child of the parties, while the separate property of the wife was "and is" of the value of only about five thousand dollars, above all encumbrances and was "and is" insufficient to support the wife and the child; that in order to induce the wife to sign the second contract the husband told her "that his father and uncle insisted upon it, and that he could not have any peace of mind unless it was signed," and that "unless she signed the same immediately that he would desert the plaintiff and go to South America"; that the wife signed the second contract "solely by reason of her love and affection

for her husband and by reason of his undue influence over her, and in order to satisfy her said husband and retain his presence with her''; that since the making of the second contract the husband has not supported the wife nor the child and that the income from the wife's separate property has not been sufficient to maintain the wife or the child, and that the wife has borrowed fifteen hundred dollars with which to support herself and the child and has been damaged in the sum of fifteen hundred dollars, no part of which has been paid; and that prior to the commencement of the action, and after the execution of the two contracts, the wife demanded of the husband that he contribute to the support of herself and the child but that he refused and has not contributed anything whatever to the support of the wife and only a small and insufficient sum to the extent "hereinabove alleged" for the support of the child. The prayer was that the two contracts be canceled and declared null and void and for general relief.

Appellant's contention that the amended complaint fails to state a cause of action is made upon several grounds. One of these is that nothing is alleged by way of excuse for the long delay in commencing the action, the original complaint having been filed but about a month short of three years from the execution of the second contract and a day short of three years after the execution of the first. Such a delay was, of course, a great one, but whether it operates as a bar to the prosecution of the action depends upon all the facts and circumstances of the case disclosed upon the face of the plaintiff's pleading. It may be conceded that the courts of this state have many times held causes of action to be barred by laches where the period elapsing before an attempt to prosecute them was less than that which transpired in the action now before us. On the other hand, cases are not lacking in which it has been determined that the lapse of an equal time will not operate as a bar. [1] No guide is furnished by any of these cases, except as to principles general in character, for the question whether a plaintiff has been guilty of laches in commencing an action must be determined upon the facts and circumstances peculiar to that particular action. One of the general rules laid down by the cases is, "as the statute of limitations is applicable to both legal and equitable actions,

there can be no laches in delaying the bringing of an action if it is brought within the period of limitation, . . . unless there are some facts or circumstances attending the delay which have operated to the injury of the defendants'' (*Meigs* v. *Pinkham,* 159 Cal. 104 [112 Pac. 883]). Practically the same rule has been stated in these terms: ''In order to bar a remedy because of laches, there must appear, in addition to mere lapse of time, some circumstances from which the defendant or some other person may be prejudiced, or there must be such lapse of time that it may be reasonably supposed that such prejudice will occur if the remedy is allowed'' (*Title Ins. Co.* v. *California Development Co.,* 171 Cal. 173 [152 Pac. 542]). [2] Another rule stated in the books is that the doctrine of laches is not strictly applied between near relatives (*Butler* v. *Hyland,* 89 Cal. 575 [26 Pac. 1108]), the principle, of course, finding a ready application in cases in which the relationship is so near, dear, and confidential as that existing between husband and wife (21 C. J. 250, 251).

[3] Either of these rules completely meets the point made by appellant. As to the first one, we can see no reason for asserting that he has been prejudiced in the least by respondent's delay in commencing the action. According to the complaint, by both specific and general allegation, no consideration passed from appellant under the two contracts. Therefore respondent has nothing of his which she could be required to surrender as a condition upon which relief might be granted her and through the retention of which by her for even a great length of time he might have been damaged. As to the second rule of law which we have mentioned, respondent is in a peculiarly strong position. Not only is she the wife of appellant, but, according to the amended complaint, the two contracts she seeks to rescind were entered into by her for the purpose of securing to herself a continuation of the relations which she had a right to expect from the very fact of marriage, but which her husband had threatened to deny her. This, we repeat, places her in a position from which she may strongly combat the charge that she unduly delayed the commencement of her action. Having made a very foolish and improvident contract, treating the two as one, for the purpose of securing her rights as a wife, other than the right to

support, which she cast away in order to hold to the remainder, she could hardly be expected to be zealously diligent in attempting to cancel the contracts. A move in that direction might imperil the very consummation she had so devoutly wished. She was justified, without incurring the charge of guilt of laches, in holding to the last possible moment to the hope that, in the language of the amended complaint, her husband would "live with her and love her as a husband should" and that she might "retain his presence with her." As the contracts were executed by the wife for the purposes shown by the amended complaint and as the husband had the degree of undue influence over her evidenced by the execution of agreements so unilateral in character, it will be presumed that, under all the circumstances shown by the pleading, the influence continued for a very long time. We hold that the amended complaint shows sufficient excuse for the delay in commencing the action.

[4] The sufficiency of the amended complaint is challenged upon the ground that its allegations make no showing of undue influence practiced upon respondent. The argument of this question is largely based upon the idea that the pleading contains no averment of the untruth of the statement ascribed to appellant "that his father and uncle would not give him any peace until the defendant had his property matters arranged with his wife as provided in the said contract, and that by reason of his mind being troubled upon that account he could not be to the plaintiff the husband he should and desired to be and that if she would sign the said contract that all would be well between them and that he would continue to live with her and love her as a husband should." We are at a loss to understand why respondent's pleading should negative the truth of these unusual assertions. It is all one whether they were true or false, so long as respondent was influenced by them to sign contracts by means of which she got nothing and gave up much and appellant got much and gave up nothing. And she was influenced to sign by his statements, as witness the allegation that she "only signed the said agreement by reason of her love and affection for the said defendant, and her trust and confidence in him and by reason of the undue influence of her said husband over her at that

time and in order to give the defendant peace of mind which he claimed he could only have when his property matters were arranged to the' satisfaction of his father and his uncle.'' Courts may pause in wonderment at the extent of human credulity, but they cannot doubt its existence, especially when it is distinctly averred. It is difficult to understand how respondent could rely upon the promises of appellant to ''live with her and love her as a husband should'' after the first contract was signed, when he asserted such flimsy reason for his inability, unless it was signed, to be ''the husband he should and desired to be.'' She did rely on them, however, as her pleading plainly shows, and they were no consideration for the valuable rights which she relinquished under the contracts, and her pleading shows that no other consideration passed to her. The husband was bound by their marriage contract to ''live with her and love her as a husband should,'' and she could not be called upon through the exertion of pressure by him to pay him to do his duty in that regard. Not only was her payment made without consideration; it was opposed to the principles of a sound and enlightened public policy. The amended complaint makes a plain showing of undue influence.

Appellant makes several other objections to the sufficiency of the amended complaint, but we are convinced that they are not meritorious and that they require no separate consideration at our hands.

[5] It is contended by appellant that several of the trial court's findings are not supported by the evidence. The court found, for instance, that respondent was ignorant of the respective rights of herself and of her husband under the two contracts and that she was unable to appreciate or understand their legal effect, and the propriety of these findings is assailed. We can see nothing more than a conflict of evidence upon the issues covered by the findings we have mentioned. There is evidence that the contracts were explained to respondent by attorneys who were in the employ of her husband, but, on the other hand, she herself testified at some length as to her utter lack of business experience and as to the very limited extent of her knowledge concerning contracts and business transactions. From her testimony upon these subjects the court was justified in con-

cluding that the explanations did not really enlighten
respondent and in finding as it did. It must be remarked,
too, that the findings in question are supported by the fact
that respondent could have been induced to enter into the
contracts at all. The pretexts upon which her husband pro-
cured her assent to them were of the most flimsy and
unsubstantial character, for the burden of the evidence
follows the allegations of the amended complaint upon the
score of the representations made by him to procure the
execution of the contracts by her. The fact that she could
be won so easily to barter away her rights as a wife is most
persuasive of the view that she labored under a distressing
want of appreciation of the nature and value of those rights
and of the extent to which she was impairing them by
executing the contracts. She was putty in the hands of
her husband, and if she ever had even a limited under-
standing of business affairs it was dethroned by his un-
husbandlike and unmanly conduct toward her. We have no
doubt that the findings we have mentioned are supported
by the evidence.

[6] The trial court found that no consideration passed
to respondent for the execution of the two contracts by her
and it is contended that this finding is without sufficient
support in the evidence. It may be that, in strictness, the
finding was not justified; but, if so, the considerations
passing to respondent were merely nominal and the dis-
parity between what she got and what appellant got under
the contracts is so marked that it may be truly said that no
substantial consideration passed to her. If, then, the finding
is technically erroneous, there is no material injury wrought
by it. A husband may not, by the undue pressure of illegiti-
mate argument or persuasion, induce a wife to part, for a
mess of pottage, with valuable rights which are hers under
the marriage covenant, and then attempt to justify the re-
linquishment by her and the seizure by him, for it was in
this instance nothing less than that, upon the ground that a
nominal consideration passed between them. In view of
these remarks it is proper for us to recapitulate the pro-
visions of the two contracts bearing upon the matter of
consideration and to state what was done under them. The
first contract provides for the payment of five dollars to
respondent, and the amount was paid. The second contract

provides that five hundred dollars should be paid to her and that amount was handed to her, but she immediately returned it to appellant, saying that she did not want it. Aside from these matters of monetary consideration, appellant by the terms of the contracts made quitclaim to respondent of property that was admittedly hers, and released her from liability to support him, a liability which can but seldom be invoked against a wife. In this instance the liability was practically *nil*, viewing the situation as of the time when the contracts were executed, for the trial court found that appellant was then worth not less than fifty thousand dollars. Respondent was then worth not more than a third of that amount. In contrast with the unsubstantial considerations moving to respondent, observe the covenants of the contracts inuring to the benefit of the husband, laying aside those matters of release and quitclaim which are reciprocal to certain of those in favor of the wife and which are of no more value. The husband is released for all time from all obligation to support the wife and from all obligation to pay alimony, attorney's fees, or court costs in any divorce action commenced by either party, and is released from liability to suits for separate maintenance. When the covenants of the contracts are thus contrasted it is at once apparent that the arrangement made by them is wofully one-sided, so much so that our remark made above is practically correct, that is, that by the contracts the husband got much while the wife got nothing. We are satisfied that the disparity between the acquisitions of the respective parties under the contracts is so great that the finding that no consideration passed to respondent is justified, or, at least, if that finding be not supported by the evidence, when strict rules are applied, then the error is harmless. In other words, under the record as presented to us the allegation of the amended complaint that *no* consideration passed to respondent for the contract is an immaterial one. If some slight consideration did pass to the wife, the contracts were practically unilateral and were manifestly unjust and unfair as to her.

[7] Appellant objects to the sufficiency of the evidence to support a finding of the trial court that appellant procured the two contracts in order to effect his release from any obligation to support respondent or to support any child

or children which might be born to the parties. We need not look far in a search for evidence to support this finding, except, it is true, that part of it referring to the maintenance of children. The finding, with the exception noted, is in accord with the terms of the two contracts entered into by the parties. We might very properly dismiss the question presented by appellant with this assertion, but we elect to pursue the subject further, for it is one which has a bearing on the entire case. A full discussion of it will present an opportunity to expose, more clearly than we have yet done, the iniquity of the arrangement which appellant wrested from respondent by means of the two contracts which he procured from her in such an illicit manner. In considering the contracts themselves, we are to remember what we have said in the last preceding paragraph upon the subject of the lack of consideration moving to the wife, for our remarks on that head are somewhat germane to the present point. From what we there said it is apparent that on the face of the contracts the only real consideration passing to the wife was the five hundred dollars, the receipt of which she acknowledged in terms; although we have shown that the consideration mentioned did not really pass, for the money was returned to appellant the moment the wife had it in her hands. The reciprocal releases and quitclaims between the parties gave to them respectively no substantial rights whatever, except only the release of the husband from all liability to support the wife. If we strip the contracts of their superflous integuments and view them in their nakedness, this release of the husband represents the whole agreement between the parties; or, keeping in mind the provision for a consideration of five hundred dollars moving to the wife, in an endeavor to ascertain the intent of the parties from the *face* of the contracts, thus escaping the conclusion that by their very terms the agreements are unilateral, we have neither more nor less than this as the effect of the documents: The wife is to be paid the sum mentioned as the price for a release of the husband from all obligation to support her. This course of reasoning would seem to demonstrate, from the face of the contracts, the propriety of the finding as to the purpose of the husband in procuring them, with the exception, again, of that

portion of the finding relating to the support of children. We shall again touch upon that part of the finding later.

It is true that the wife says in her testimony that the husband besought her to "sign away" her interest in his property. It is true that the husband testified in practically the same manner, as witness the following question addressed to him and his answer to it: "The Court: But what was the direct result you expected to accomplish, was it that you expected by this to prevent her from inheriting your property, or was it to relieve you of the trouble of having to support her? A. No, no; it was just simply to have my property in some definite shape, to please my father and uncle, because, as I say, I was very much obligated to them." This testimony about the wife "signing away" her interest in the property and about the husband's desire to have his property "in some definite shape" is in strict accord with the *letter* of the two contracts. She did sign away her interest, *in terms,* but the signing away amounted to absolutely nothing when considered apart from the matter of her right to support and maintenance out of whatever income the husband received or whatever property he possessed, and apart from her release of the husband from all liability to support and maintain her. Who can deny that the two contracts would amount to nothing if the release clause just mentioned were not incorporated in them? If they had been executed in all respects as they are, but with the release clause omitted, they would have been mere scraps of paper; and it is quite apparent to us that, with the release clause omitted, the husband would not have urged that they be executed. There is nothing in the record before us to show that the wife ever made claim to any interest in the husband's property. On the other hand, there is not the slightest doubt that the property was the husband's separate estate and that the wife had never disputed the fact. The property all stood of record in the husband's name. According to the undisputed fact, it was a. gift from his father and his uncle. That is what the husband refers to in the answer quoted above when he says, "I was very much obligated to them." The mere fact that the release clause was included in the contracts at all, taken in connection with the fact that the property was the husband's separate estate, is most persuasive of the view that

the clause was inserted as the main feature of the agreements. It was solely through her right to support and maintenance that the wife could make any claim upon the separate property of the husband or upon his income arising from it. Therefore a deprivation of her right to support and maintenance was the one great thing to be accomplished, and we are satisfied that the arguments addressed by the husband to the wife were employed, in effect, for the purpose of inducing her consent to the release clause. It is apparent to us that the trial court was justified in finding that the purpose of the husband in procuring the contracts was to effect a release from his obligation to support her.

We have left for later treatment that portion of the finding now under discussion to the effect that the purpose of appellant in procuring the contracts was to effect a release from obligation to support children which might be born to the parties. This part of the finding is not warranted by anything appearing in the contracts, for their terms will not allow a construction indicating any such intent on the part of appellant. In truth, this view is assented to by respondent. She argues, however, that her testimony to the effect that appellant failed to contribute substantially to the support of the child born to the parties some months after the execution of the contracts, by relation back, sufficiently shows an intent on appellant's part, in procuring the contracts, to escape liability to support children thereafter to be born. We cannot assent to such a proposition. The entire circumstances of the case convince us that appellant believed at the time the contracts were executed that no children would ever be born to respondent and him. The amended complaint alleges and the evidence conclusively shows that when the contracts were signed neither of the parties suspected the impending arrival of the child which was born some months later. Further, we are convinced that the husband believed at the time of the execution of the contracts that he and respondent would not be long together and that for that reason he had not in mind the possible coming of children. The contracts do not by their terms contemplate a separation, it is true. Nevertheless, and although appellant could sacrifice the rights of his wife by persuading her to execute such contracts as those before us merely, to use his own words, "to please my

father and uncle," and to "make them feel better," we cannot convict him of the enormity of desiring to remain long with a wife from whom he had wrung a contract providing for his release from all liability to support and maintain her. We are satisfied, then, that all thought of children was out of his mind. It is true that he did remain with the wife until shortly after the coming of the child and he says he did "take care" of her during that period. He would have been hard indeed could he have done otherwise. The second contract was executed July 12, 1915, and the child was born April 7, 1916, less than nine months afterward. If we take the period of 280 days, the time fixed by science as the average period of gestation, instead of the even nine months popularly ascribed to that phenomenon, respondent was ten days advanced in her pregnancy at the time the second contract was signed. At any rate, her condition could not have remained a secret for any great length of time after the execution of that document. Under such conditions it would be practically impossible for any man to forsake his wife. These remarks will serve to explain why, in our opinion, a separation of the parties did not occur immediately after the signing of the second contract; and the fact that it did occur soon after the child was born further supports our theory. We are satisfied that in procuring the contracts appellant had no purpose to escape liability for the support of children and that the finding to the contrary is not warranted by the evidence. We are far from deciding, however, that the impropriety of this finding amounts to reversible error. As we have already shown, the two contracts sought to be rescinded are so palpably unjust and unfair to respondent, on other grounds, that the failure to find correctly upon this issue is harmless. It makes no difference whether or not appellant purposed by the procuring of the contracts to avoid liability to support children later to be born to respondent and him.

Respondent alleged in her amended complaint that she was worth only about five thousand dollars at the time of the execution of the two contracts between the parties. This averment was denied by appellant and in addition he alleged affirmatively that respondent was worth "to exceed" sixteen thousand dollars. The trial court found

upon these issues that respondent was worth five thousand dollars and it is contended that the finding is not supported by the evidence. This contention must be sustained, as there is no evidence in the record upon which the court might properly have based the finding. If, however, we take the worth of respondent as it is alleged in appellant's answer, that is, as being the sum of sixteen thousand dollars, we are unable to see that what we have said above as to the unfairness of the contracts to the wife is to any extent affected. If the trial court had found respondent's worth to be as alleged in the answer, we could have taken no different view of the merits of the cause. It is therefore apparent to us that the court's error in finding her worth to be but five thousand dollars was harmless and unprejudicial.

[8]    Section 159 of the Civil Code provides: "A husband and wife cannot, by any contract with each other, alter their legal relations, except as to property, and except that they may agree in writing, to an immediate separation, and may make provision for the support of either of them and of their children during such separation." Inasmuch as the contracts between respondent and appellant makes no provision for a separation of the parties, either "immediate" or otherwise, respondent contends that the contracts are void as against the public policy indicated by the terms of section 159. Under the views which we have above expressed as to the effect and main purpose of these contracts, we are of the opinion that the point made by respondent is well taken. The contracts are within the language of the supreme court in *Pereira* v. *Pereira,* 156 Cal 1 [134 Am. St. Rep. 107, 23 L. R. A. (N. S.) 880, 103 Pac. 488]. By their terms appellant was placed in such a position that he might at any time abandon respondent, or commit any other breach of the marriage covenant, with impunity, except that respondent could secure a decree of divorce from him. By the contracts he was granted complete immunity from any financial charge whatever, and that, too, whether he continued to live with his wife, either as a faithful or a faithless husband, or whether he deserted her in whatever shameless a manner; and he was equally freed from liability to suit for separate maintenance, however flagrant his conduct. Such contracts af-

ford most persuasive temptation to marital infidelity, and cannot be upheld, even if we forget the existence of such legislation as is embraced in section 159.

We need not consider the various other respects in which it is contended by appellant that the trial court committed error.

Judgment affirmed.

Finlayson, P. J., and Craig, J., concurred.