[Civ. Nos. 14366, 14548.   Second Dist., Div. Three.   Jan. 24, 1945.]

Estate of GUS B. CALDWELL, Deceased. BERT M. CALDWELL, as Executor, etc., Appellant, v. FLORENCE M. CALDWELL, Respondent.

L. G. Hayford and Harrie R. Collins for Appellant.

Gregory M. Creutz for Respondent.

WOOD (Parker), J.—The executor of the will of Gus B. Caldwell, deceased, has appealed from three orders of the superior court as follows: (1) an order denying the executor's petition to vacate an order awarding to the widow a family allowance of $100 per month from the date of death to the date of filing the inventory, amounting to the sum of $630; (2) an order setting apart to the widow, as property exempt from execution, the proceeds of a life insurance policy in the sum of $3,000; and (3) an order awarding to the widow a family allowance of $100 per month from the date of filing the inventory, January 25, 1943, until the final settlement of the estate.

Gus B. Caldwell and Florence M. Caldwell were married in 1918, and they lived together until September 4, 1933, when he left their home about 11 p. m. without her knowledge and without any notice to her of his intention to leave. Thereafter he resided separate and apart from her. He died on July 17, 1942. The record does not disclose his reason for leaving. There had been no trouble between them, and their relationship had been pleasant. The morning after he left he telephoned to her and said that he would support her as best he could. From the time he left in 1933 until April 1, 1938, he paid her $50 each month and paid the utility bills. After April 1, 1938, he was not employed regularly and his income was not sufficient to enable him to furnish any support to her, except that he did give her $5.00 or $10.00 on her birthdays and at Christmas. After he left they continued to treat each other affectionately. From the time he left until his death he visited her about every Sunday from 9 a. m. to 9 p. m., and he visited her several times each week on other days. At times, when he was at her house on rainy evenings, he stayed all night but he did not occupy a room with his wife. On several occasions when he was sick she went to the place where he was living and assisted in caring for him. In 1940 when she was sick and confined to her bed for five months he assisted in nursing her on many occasions. After 1933 a "considerable" part of his mail was received at her address. At various times after he had left the home her daughter mended his clothes. When he registered as a voter in 1940 he stated that he resided at 1815 Fremont Avenue, South Pasadena, which was the address where his wife resided, and in that year he voted in that precinct. During the ten months preceding his death

he was engaged in work wherein it was necessary that he be notified each morning whether his services would be required on that day, and he asked his employer to notify him by telephone at his wife's address. Every morning while he was so employed she or her daughter notified him whether such a telephone message had been received. Mrs. Caldwell testified that she said to him on an occasion, when he complained about the dampness of the room where he was living, that he "had better come back" to her house, and he said that she and her daughter were sick and "It wouldn't be fair to you"; and that on another occasion when he was living and working in the south part of Los Angeles she asked him to come back, and he said the distance was too great for him to go back and forth from the home in South Pasadena to his place of work. She testified further that, "In fact, it didn't make a great deal of difference whether he came back or not, he was there practically every day."

During practically all the time when they lived together they occupied property which was separately owned by her, and while they were living together she contributed a substantial amount of her separate property for their support. There was testimony to the effect that when she petitioned for a family allowance and to have exempt property set apart to her she was in poor health and did not have sufficient funds with which to support herself. The premiums on the insurance policy were paid in part by the husband's employer and in part by the husband from community funds. The appraised value of his estate was $9,751.54.

On August 9, 1935, Mr. and Mrs. Caldwell entered into a property settlement agreement which provided in part as follows:

"That henceforth each of the parties hereto shall own, hold, possess, and control any and all property that he or she now has, and any and all property of any kind or character, or any right, title or interest therein, that he or she may hereafter in any manner acquire or obtain, as his or her sole and separate property free and clear of any right, title, interest, claim or demand of the other party hereto now existing or which may hereafter arise by reason of the marital relation of the parties hereto; and that each of said parties shall have the right to enter into any contracts or obligations and to enter into and transact any business of any kind whatsoever

in connection with his or her property, or otherwise, free and clear of any right, title, interest, claim or demand of the other party hereto; and that the earnings and accumulations of each party hereto shall be and remain the sole and separate property of such party; and each of the parties hereto does hereby release and discharge the other party of and from any and all claims or demands for any share, portion or interest in or to any or all of the earnings or accumulations of the other party hereto. Provided, however, that nothing herein contained shall be construed as affecting any obligation that may be imposed by law upon First Party as the husband for the support of his wife, the Second Party herein.''

Appellant contends that a family allowance and the life insurance proceeds should not have been awarded to the widow for the reasons, among others, that (1) she was not a member of his family at the time of his death, (2) she consented expressly or impliedly to the separation, and (3) she released him from his obligation to support her and waived her rights as a widow by the execution of the property settlement agreement.

The right of a widow to a family allowance is not conditioned upon her having lived in a family relation with her husband at the time of his death, and her right to such an allowance must be determined independently of the circumstance that she had not lived with her husband for some years prior to his decease. (*Estate of Gould* (1919), 181 Cal. 11, 13 [183 P. 146].)

Section 175 of the Civil Code provides: "A husband abandoned by his wife is not liable for her support until she offers to return, unless she was justified, by his misconduct, in abandoning him; nor is he liable for her support when she is living separate from him, by agreement, unless such support is stipulated in the agreement." In this case the wife did not abandon her husband; on the contrary, he went away from her and from their home. His reason for leaving her is not shown by the record, and it does not appear that she caused him to leave. The finding of the trial judges that she did not consent to the separation is supported by the evidence. Even if she were living separate from him by agreement, it appears that he agreed to support her. The next morning after he left he told her he would support her as best he could, and he complied with his agreement. The written agreement of

1935 provided that nothing therein should affect any obligation imposed upon him by law for the support of his wife.

■ The widow's claim to a family allowance is favored in the law, and her right thereto should not be held to have been surrendered by an agreement between the spouses except by clear and explicit language. (*Estate of Whitney* (1916), 171 Cal. 750, 755, 756 [154 P. 855]; *Estate of Bidigare* (1932), 215 Cal. 28, 30 [8 P.2d 123].) ■ The written agreement shows by clear and explicit language that Mrs. Caldwell did not release him from his obligation to support her. She did not waive her right to a family allowance and did not waive her right to property exempt from execution. The trial judges were not in error in construing the agreement as insufficient to constitute a waiver by Mrs. Caldwell of any of her legal rights in and to the policy of insurance or the proceeds thereof in the event of Mr. Caldwell's death.

In the *Estate of Ehler* (1931), 115 Cal.App. 403 [1 P.2d 546], the widow, who had left the decedent and had commenced an action for divorce, petitioned for a family allowance and to have certain property set aside to her as property exempt from execution. The record therein did not show whether she left him voluntarily or for good cause, and the court said at page 405, "[T]here was a total absence of any showing that respondent by her conduct lost her statutory rights as the widow of decedent.". The court held therein that it was proper to award a family allowance and the proceeds of the life insurance policy to the widow.

■ The order above mentioned denying the executor's petition to vacate the first order for a family allowance was not an appealable order. (Prob. Code, § 1240.) The first order for a family allowance, signed by the judge, was filed on December 7, 1942. No appeal was taken from that order and it became final before the petition to vacate was filed on February 16, 1943.

The appeal from the order denying the petition to vacate the order of December 7, 1942, awarding a family allowance until the filing of the inventory, is dismissed. The order setting apart to the widow the proceeds of the life insurance policy is affirmed. The order awarding the widow a family allowance, from the date of filing the inventory until the settlement of the estate, is affirmed.

Desmond, P. J., and Shinn, J., concurred.