[Civ. No. 20518.   Second Dist., Div. One.   May 10, 1955.]

WALLACE LINVILLE, Appellant, v. MADELINE PATTERSON LINVILLE, Respondent.

John C. Goff and Robert L. Moore for Appellant.

George H. Pratt for Respondent.

DRAPEAU, J.—Plaintiff husband sought a divorce from defendant. Defendant answered and filed a cross-complaint for divorce. Both alleged cruelty on the part of the other.

The trial court found that plaintiff treated defendant in a cruel and inhuman manner without cause; that the ranch home of the family in Baldwin Park was purchased with funds which were originally the separate property of plaintiff, but that it had been transmuted into community property by an executed oral agreement of the parties; that plaintiff is able to pay $100 per month for the support of each of the three minor children and $100 per month for the support of defendant; and that defendant is a fit and proper person to have custody and care of said children.

In accordance with such findings, the court awarded to defendant:

(1) a divorce on her cross-complaint;

(2) the custody of the minor children;

(3) the Baldwin Park residence as her separate property; and ordered plaintiff to pay $400 per month for support of the children and defendant wife.

Plaintiff appeals from those portions of the interlocutory judgment of divorce which (1) decrees that the Baldwin Park property is community property and awards it to defendant; and (2) orders him to pay $400 per month for support and alimony.

It is first urged that the evidence fails to establish an oral agreement transmuting appellant's separate funds into community property. In other words, that the finding respecting such agreement is not supported by the record.

"In disposing of such a contention, this court's power begins and ends with a determination as to whether there is any substantial evidence to support the findings." (*Estate of Raphael*, 91 Cal.App.2d 931, 936 [206 P.2d 391].)

Respondent testified that the Baldwin Park ranch was acquired in April of 1944, and that in discussing the venture she asked appellant: "Is this going to be our house and our home? Is it going to be our property, or is it going to be the way it has always been, where everything is supposed to be yours?" And appellant answered: "It will be ours."

In 1947, appellant was having some difficulty with his business and thought of selling the home. Respondent told him that rather than sell it, she would teach school. She said: "It is our house . . . It is my house, and I want to go into it, and teach school so we can keep the house . . . he agreed that if I wanted to do that, that was all right . . . I taught school for six years."

In 1951, the house was in need of repairs. Respondent discussed this with appellant who said he could not afford to do it then. Respondent offered to get a loan and pay it off, because "it was our house, our property, and I didn't want to lose it." Appellant agreed. Respondent borrowed $2,400; they both signed the note and respondent paid it off.

Respondent's brother testified that he discussed the Baldwin Park property with appellant. They agreed that it was a very attractive place, but appellant thought it should be sold. When the witness asked him why he did not sell it, appellant replied: "Madeline has an interest in this property. I have to respect her voice, and she doesn't want to sell it."

Appellant denied in its entirety, all the testimony of respondent hereinbefore summarized, except that respondent signed the note for the repair loan and made the payments thereon. He also denied that he ever had any conversation with respondent's brother in which he discussed the sale of the property.

Whether the statements of respondent and the conduct of appellant indicated an intent on the part of the latter to transmute his separate property into a community interest with respondent was a question for the trier of fact. (*Marvin* v. *Marvin*, 46 Cal.App.2d 551, 557 [116 P.2d 151]; *Nevins* v. *Nevins*, 129 Cal.App.2d 150, 156 [276 P.2d 655].)

As stated in *Estate of Raphael*, 91 Cal.App.2d 931,

939 [206 P.2d 391]: "All that is required to show an executed oral agreement of transmutation is proof of the parties' acts and conduct in dealing with their property. (*Kenney* v. *Kenney, supra,* (220 Cal. 134 [30 P.2d 398]).) ▮ In an executory contract some act remains to be done, while in an executed contract everything is completed at the time of the agreement without any outstanding promise calling for fulfillment by the further act of either party. (*Mather* v. *Mather,* 25 Cal.2d 582 [154 P.2d 684].) The object of the oral agreement of transmutation was fully performed when the agreement was made for it immediately transmuted and converted the separate property of each spouse into community property and nothing further remained to be done."

In the cited case, the widow Raphael testified that decedent told her "we were partners . . . and we had to file taxes, and he said that everything he had was mine, and everything I had was his; that we were partners in everything, and everything was fifty-fifty."

Other cases in which testimony of an oral agreement was held to constitute sufficient proof to support a finding that separate property had been transmuted into community property were referred to in the Raphael case:

*Kenney* v. *Kenney,* 220 Cal. 134 [30 P.2d 398], where the husband testified that the parties had orally agreed, both before and after marriage, that all property then owned by them or subsequently acquired was to belong to them equally or "fifty-fifty."

*Stice* v. *Stice,* 81 Cal.App.2d 792, 798 [185 P.2d 402] in which the wife testified that the husband "always said that everything we had was community property—belonged to both of us," and that "he said it hundreds of times."

*Durrell* v. *Bacon,* 138 Cal.App. 396, 398 [32 P.2d 644], where the husband testified that his wife, who had separate property, told him "what is mine is yours and what is yours is mine . . . this money will go into a home for us; it is just as much yours as mine."

▮ And as stated in *Estate of Sill,* 121 Cal.App. 202, 204 [9 P.2d 243]:

"It clearly appears . . . that the agreement or understanding between the parties is not required to be in any particular words and need not be attended with any particular formality as long as it may be fairly inferred from all of the circumstances in evidence that a community interest was intended by the parties." In the Sill case, the words

used were: "It is just as much yours as it is mine; this is our home."

See also *Faust* v. *Faust*, 91 Cal.App.2d 304, 308 [204 P.2d 906].

▇ Tested by the foregoing principles, it is clear that the evidence presented substantially supports the trial court's finding of an executed oral agreement transmuting separate property into community property.

Appellant also contends that the amounts awarded for alimony and child support are so grossly excessive as to constitute an abuse of discretion by the trial court.

▇ Appellant testified at the trial that he was receiving $400 per month salary from Western Highway Institute. He also estimated that he would earn from two to three hundred dollars per month editing the Journal for Petroleum Educational Institute. In addition, appellant testified that he was receiving substantial monthly rentals from several other properties owned by him.

In the circumstances, the allowance of alimony in the sum of $100 per month, and $300 per month for the support of the three minor children constituted a proper exercise of the discretion lodged with the trial court.

For the reasons stated, the judgment is affirmed.

White, P. J., and Doran, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied July 6, 1955.